UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

KELEE L. Y.,[1]
Plaintiff,
v.
SSA COMMISSIONER,
Defendant.

Case No. 25-cv-04891-RMI

**ORDER RESOLVING SOCIAL SECURITY APPEAL**

Re: Dkt. Nos. 13, 17

Plaintiff seeks judicial review of an administrative law judge ("ALJ") decision finding that she was not disabled under Title XVI of the Social Security Act. The Appeals Council of the Social Security Administration declined to review the ALJ's decision. The ALJ's decision is therefore a "final decision" of the Commissioner of Social Security ("Commissioner") and is reviewable by this court. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Both Plaintiff and the Commissioner have consented to jurisdiction of a magistrate judge (dkts. 8, 9), and both parties have filed briefs (dkts. 13, 17, 18). For the reasons explained herein, the ALJ's decision is **REVERSED**, and this case is **REMANDED** in accordance with this Order.

## BACKGROUND

Plaintiff is a 54-year-old woman who alleges disability due to epilepsy, anxiety, and injury stemming from a motor vehicle accident. *See* Admin. Rec. at 45, 48, 279.[2] She filed an application

[1] Pursuant to the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States, Plaintiff's name is partially redacted.

[2] The Administrative Record ("AR") is independently paginated and was filed as an attachment to Docket Entry #12.

for supplemental social security income under Title XVI of the Social Security Act on June 2, 2022.[3] (AR 247–55) The Commissioner first denied Plaintiff's claim on October 17, 2022 (AR 151), and then again on reconsideration on September 19, 2023. (AR 161) Plaintiff requested a hearing before an ALJ, which was held via telephone on March 21, 2024. (AR 18, 44, 174)

*Summary of the Hearing*

At the hearing, Plaintiff testified to her seizure history, types of seizures, and side effects from her seizure disorder. Her driver's license was revoked in 2003 after she had a seizure behind the wheel. (AR 50) She began seeing a neurologist, Dr. Max Duncan, in 2021 and reported that she sees him approximately every six months. (AR 51) Plaintiff's visits with Dr. Duncan involve bloodwork and an evaluation of whether her medication is working for her. (AR 51) She "does [her] best" to keep a seizure log, stating that it is "difficult for [her] to know when [she's] had the seizure[.]" (AR 52) The only EEG she has undergone was when she first saw Dr. Duncan. (AR 53)

Plaintiff stated that she has approximately five to ten petit mal seizures per month (AR 54) and that since she has been seeing Dr. Duncan, she has two to three grand mal seizures per month. (AR 54) During a petit mal seizure, Plaintiff finds herself "kind of standing and getting confused[,]" "not really remembering what [she] was doing," "confused," and "staring in weird spaces[.]" (AR 55) She does not remember them, but people have told her that she looks like she is "standing there in a daze." (AR 55) After she has a petit mal seizure, she reported that it takes her ten to twenty minutes to recover. (AR 57) When she has a grand mal seizure, "[f]rom what [she's] been told[,]" she yells very loudly, occasionally rips hair out of her own head, and thrashes around, "usually" biting holes in her mouth and through her tongue. (AR 56)

Plaintiff also testified at the hearing that Dr. Duncan told her that, given her seizures, "he didn't feel that [Plaintiff] would be able to work anymore" because she would be a "liability" to any employer. (AR 58) She has not worked since 2006. (AR 65, 266)

Plaintiff always walks with a limp, and her neck and left shoulder frequently hurt. (AR 59)

---

[3] Plaintiff also filed on June 2, 2022, an application for Disability Insurance Benefits under Title II of the Social Security Act. This order applies only as to her claim for supplemental security income. At her hearing, Plaintiff amended her alleged onset date to April 20, 2022. (AR 18, 48–49, 268)

She uses a cane to walk and has difficulty with stairs. (AR 59) Plaintiff smokes marijuana every day and used methamphetamine for three years approximately fifteen years ago. (AR 63–64)

A vocational expert also testified at the hearing and answered three hypotheticals posed by the ALJ. (AR 65–68)

The ALJ first asked:

> [L]et's assume we have an individual with the Claimant's age, education and background, let's assume in my first hypothetical there's no exertional limitations, however the non-exertional limitations apply, there are safety seizure precautions, there should be no professional driving, no work at heights or with heavy or hazardous machinery, there should be no climbing of ladders, ropes and scaffolding. If we have these restrictions can you give me three examples please with numbers in the nation?

(AR 65–66) In response, the vocational expert reported three positions that would satisfy the ALJ's hypothetical restrictions, including retail, laundry worker, and cashier.[4] (AR 66–67)

The ALJ then asked the expert if there were any available positions if the same hypothetical worker was regularly absent two days per month, to which the expert replied that the jobs she had previously cited "would not be viable[]" and that "this individual could not sustain a full-time job." (AR 67) The ALJ then asked the expert if there would be any available positions if the hypothetical worker from her first question has "periods where they were off task because of medical issues" and had a "non-productive period for 20% or more regularly." (AR 67) The vocational expert again answered that the "prior work would be excluded[.]" (AR 67–68)

*Summary of the Relevant Medical Evidence*

The medical evidence in the Administrative Record includes documentation of Plaintiff's medical care from primary care providers; emergency room physicians; mental health practitioners; physical therapists and an orthopedic specialist; an internal medicine physician; and Plaintiff's treating neurologist. Plaintiff's primary care provider referred her to a therapist in 2020 for "anxiety" and "coping with situational stress." (AR 444) Her primary care provider detailed her history of seizures and anxiety in reports dating back to 2011. (AR 417–43, 450–60, 766–80, 917–22) A

---

[4] Specifically, the vocational expert stated that the positions were "marker, retail trade, DOT code 209.587-034, SVP 2, light," "[laundry] worker II, DOT code 361.685-018, SVP 2, medium," and "cashier II, DOT code 211.462-010, SVP 2, light[.]" (AR 66–67)

consultative psychologist examined Plaintiff in 2023 and found mild to moderate impairment as to her ability to be functional in the workplace. (AR 614–20) Plaintiff also received emergency care for anxiety and panic attacks. (AR 580–87) Her therapy visits resumed in 2023 after she was again referred to a therapist due to "her trauma and symptoms of depression related to a recent MVA, as well as previous traumas related to health condition and an interaction with her son." (AR 753–65, 873–913) Plaintiff underwent a depression screening in March 2024, was assessed as having Post Traumatic Stress Disorder, and was subsequently referred to a psychiatrist. (AR 914–16)

Additionally, Plaintiff sought emergency care after she was hit by a truck backing up in 2023 (AR 626–29), and she received an MRI and x-rays that revealed that she sustained injury to her hamstring and hip. (AR 648–57, 694–97, 772–74, 832–34) Plaintiff was issued a walker after her accident and referred to physical therapy (AR 851–54); she had difficultly walking, symptoms of pain, and some documented falls from seizures (AR 782–816). She was also evaluated by an internal medicine physician in August 2023, and the examining physician noted that she "appropriately uses a cane," was "[s]lowly able to care for her personal needs[,]" had "[w]ell-documented grand mal seizures . . . intermixed with petit mal seizures," and had limitations on maximum standing and walking capacity, maximum lifting and carrying capacity, postural activities, and workplace environmental exposures. (AR 818–22)

Documentation dating back to 2021 from Plaintiff's treating neurologist, Dr. Duncan, reports medication adjustments, recent seizures, side effects from her seizures, lab work, results from an EEG, and medication for anxiety. (AR 498–555, 563–70, 594–607, 611–13, 630–43, 734–41, 824–31, 839–49, 857–60) Crucially, Dr. Duncan documented in 2024 that she suffers two to three seizures per week, typically for thirty minutes, with precipitating factors of stress and exertion. (AR 824–27)

*Summary of the ALJ's Decision*

On June 27, 2024, the ALJ issued a written decision, finding that Plaintiff was not disabled as defined by the Social Security Act. (AR 15–34) The ALJ followed the five-step process to determine whether a claimant qualifies for disability benefits (AR 21–33). *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

United States District Court
Northern District of California

At the first step, the ALJ determines whether claimant has engaged in substantial gainful activity. *See* 20 C.F.R. §§ 404.1520(b), 416.920(b). Here, the ALJ found that Plaintiff has not engaged in substantial gainful activity since her amended onset date of April 20, 2022. (AR 21)

At the second step, the ALJ determines whether the claimant has a severe impairment, or combination of impairments, that significantly limits the claimant's physical or mental ability to perform basic work activities. *See* 20 C.F.R. §§ 404.1520(c), 416.920(c). Here, the ALJ found that Plaintiff's generalized seizure disorder constituted a severe impairment that significantly limits her ability to perform basic work activities. (AR 21) The ALJ also found the following impairments to be nonsevere: Plaintiff's post-car accident injuries; "degenerative changes of the left shoulder, cervical spine, and lumbar spine[]"; substance abuse; "mild neurocognitive impairment[]"; and anxiety disorder. (AR 21) With regards to Plaintiff's post-car accident injuries in April 2023, the ALJ determined that they were nonsevere due to her progress in physical therapy, lack of documentation as to further deficits after receiving physical therapy, and her ability to "perform all activities of daily living independently." (AR 21–22) As to Plaintiff's mental impairments of substance abuse, neurocognitive disorder, and anxiety disorder, the ALJ considered the duration and treatment of Plaintiff's reported symptoms as well as the opinions of the medical experts set forth in the medical evidence. (AR 22–23) The ALJ walked through the factors set forth in the regulations pertaining to four functional areas and found that Plaintiff suffered only from mild limitations. (AR 24–25)

At the third step, the ALJ determines whether the severity of claimant's impairment or combination of impairments meets or medically equals the criteria of any listed impairments. *See* 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d). Here, the ALJ found that Plaintiff's seizure disorder does not meet or medically equal the severity of Listing 11.02 (Epilepsy). (AR 25) In so finding, the ALJ noted that the record does not support Plaintiff's full adherence to her medication, the frequency of seizures required to satisfy the listing's requirements, nor a finding of dyscognitive seizures. (AR 25–26)

At the fourth step, the ALJ determines the claimant's residual functional capacity ("RFC") to still perform past relevant work. The RFC describes what the claimant can still do despite his or

her physical, mental, and other limitations. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a). Here, the ALJ found that Plaintiff has the RFC to perform a full range of work "at all exertional levels" but with the following limitations: safety seizure precautions; no heights or heavy or hazardous machinery; and no climbing ladders, ropes, and scaffolds. (AR 27) The ALJ determined that her seizure disorder "could reasonably be expected to cause" her reported symptoms but that the "intensity, persistence and limiting effects" of the reported symptoms "are not entirely consistent with the medical evidence and other evidence in the record" because of the "substantial periods of time" during which Plaintiff's seizures were self-reported and because of inconsistencies between Plaintiff's testimony and the medical reports of the frequency of her seizures. (AR 30–31)

At the fifth step, the ALJ determines whether the claimant can engage in other types of substantial gainful work that exists in the national economy based on the claimant's RFC, age, education, and work experience. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g). Here, the ALJ found that Plaintiff could work in jobs "that exist in significant numbers in the national economy[,]" crediting the vocational expert's testimony as to available jobs. (AR 33–34) The ALJ therefore found Plaintiff to not be disabled.

After the ALJ issued an unfavorable decision, Plaintiff requested review with the Appeals Council, which was denied on April 18, 2025. (AR 1–4) As such, the ALJ's decision became the final decision of the Commissioner and therefore appealable to this court.

## LEGAL STANDARD

The Social Security Act limits judicial review of the ALJ's decision to final decisions made after a hearing. 42 U.S.C. § 405(g). The Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." *Id.* A district court's scope of review is limited and may only set aside a denial of benefits if the ALJ's decision is not supported by substantial evidence or is based on legal error. *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995). "Substantial evidence," a phrase that appears throughout administrative law, directs courts in their review of factual findings at the agency level and is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "In determining

United States District Court
Northern District of California

whether the Commissioner's findings are supported by substantial evidence," a district court must review the administrative record as whole and consider "both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). Where evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion is upheld. *Burch v. Barnhart*, 400 F.4d 676, 679 (9th Cir. 2005). Courts "review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he [or she] did not rely." *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014).

## ANALYSIS

Asking the court to remand for further proceedings, Plaintiff alleges the following errors: (1) the ALJ failed to provide clear, convincing, and well-supported reasons for discounting Plaintiff's allegations of mental dysfunction; (2) the ALJ failed to properly evaluate the examining medical source opinion of the consultative psychological consultant; (3) the ALJ failed to provide clear and convincing reasons for discounting Plaintiff's allegations regarding the frequency and limiting effects of her seizures; (4) the ALJ failed to properly evaluate whether Plaintiff's seizure disorder met or medically equaled the criteria of Listing 11.02; (5) the ALJ failed to properly evaluate the treating medical source opinions of Plaintiff's neurologist; (6) the ALJ erred in concluding that Plaintiff's musculoskeletal impairments were nonsevere and warranted no physical work restrictions; and (7) the ALJ failed to properly evaluate the examining medical source opinion of the consultative internal medicine doctor. (Pl.'s Br., Dkt. 13)

### A. The ALJ Erred at Step Two

Plaintiff argues that the ALJ improperly discounted clinical evidence and Plaintiff's allegations that she had "severe mental symptoms arising from her anxiety disorder." (Pl.'s Br. at 4) Plaintiff contends that the record demonstrates that her anxiety limited her ability to work. (*Id.* at 5) She also asserts that the ALJ failed to properly evaluate the medical source opinion of Dr. Megan Stafford, a consultative psychologist. (*Id.* at 7) She contends that the ALJ misapplied the consistency factor when the ALJ discounted Dr. Stafford's opinion because it was "purportedly inconsistent" with Plaintiff's mental status and "conservative" mental health treatment. (*Id.* at 9)

The Commissioner, on the other hand, asserts that the ALJ reasonably found that Plaintiff's anxiety and neurocognitive disorder were nonsevere because the ALJ reasonably inferred from the record that her anxiety was being effectively controlled on medication. (Comm'r's Br. at 2–3) The Commissioner additionally argues that the fact that the ALJ was unpersuaded by Dr. Stafford's opinion that Plaintiff was subject to moderate limitations in several areas does not constitute legal error. (*Id.* at 7)

The inquiry at step two of the five-step sequential evaluation process requires the ALJ to assess whether the claimant has a medically severe impairment or combination of impairments that significantly limits his or her ability to do basic work activities. 20 C.F.R. § 404.1521(a)(4)(iii). The "ability to do basic work activities" is defined as "the abilities and aptitudes necessary to do most jobs." *Id.* § 404.1521(b). The evaluation at this step of the process is a *de minimis* test intended to cull only minor impairments and to filter for baseless claims. *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996). "Ample authority cautions against a determination of nondisability at step two." *Ortiz v. Comm'r of Soc. Sec.*, 425 F. App'x 653, 655 (9th Cir. 2011) (citing *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987); *Webb v. Barhart*, 433 F.3d 683, 686 (9th Cir. 2005); and *Smolen*, 80 F.3d at 1290)).

"In assessing the credibility of a claimant's testimony regarding subjective pain or the intensity of symptoms, the ALJ engages in a two-step analysis." *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012). The ALJ must first determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged. *Vazquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). "If the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of those symptoms if she gives specific, clear and convincing reasons for the rejection." *Id.* (citation modified).

"An ALJ is not required to believe every allegation of disabling pain." *Ahearn v. Saul*, 988 F.3d 1111, 1116 (9th Cir. 2021). Rather, an ALJ must consider a claimant's testimony in light of objective medical evidence and the record as a whole. 20 C.F.R. §§416.920(a)–(c). Where an ALJ provides clear and convincing reasons to discount a claimant's subjective complaints, a reviewing

court must affirm. *Rollins v. Massanari*, 261 F.3d 853, 859 (9th Cir. 2001). An ALJ "must specifically identify the testimony she or he finds not to be credible and must explain what evidence undermines the testimony." *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001). "The evidence upon which the ALJ relies must be substantial." *Id.* General findings will not suffice. *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995). "Once the claimant produces medical evidence of an underlying impairment, the Commissioner may not discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence." *Id.* And "although an ALJ may use inconsistent objective medical evidence in the record to discount subjective symptom testimony, the ALJ cannot effectively render a claimant's subjective symptom testimony superfluous by demanding positive objective medical evidence fully corroborating every allegation within the subjective testimony." *Ferguson v. O'Malley*, 95 F.4th 1194, 1200 (9th Cir. 2024).

In its evaluation of opinion evidence, an ALJ need only provide "an explanation supported by substantial evidence." *Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022). An ALJ must explain the persuasiveness of medical opinions based on the opinions' supportability and consistency with the record. 20 C.F.R. § 416.920(c); *Woods*, 32 F.4th at 791–92. Supportability "means the extent to which a medical source supports the medical opinion by explaining the 'relevant objective medical evidence.'" (*Id.* (quoting 20 C.F.R. § 404.1520c(c)(1) (citation modified)). Consistency "means the extent to which a medical opinion is 'consistent with the evidence from other medical sources and nonmedical sources in the claim.'" *Id.* at 792 (quoting 20 C.F.R. § 404.1520c(c)(2). An ALJ is not required to consider other facts unless the ALJ finds that two or more medical opinions about the same issue are equally persuasive. 20 C.F.R. § 416.920c(b)(3).

Here, the ALJ found that "[a] finding of nonsevere mental impairments is supported by the treatment records[,]" stating that Plaintiff's anxiety was "controlled" with Busiprone until July 2023 and that she sought counseling after the car accident in 2023. (AR 22) The ALJ acknowledged Plaintiff reported "worsened anxiety/distress" because of that accident as well as "remote and recent traumas" and that she was experiencing "restlessness, excessive worry, difficulty concentrating, distressing dreams, and ongoing triggers." (AR 22) The ALJ relies on notes within mental status

exams that "generally noted her as engaged, oriented, with sufficient concentration, normal thought process and content, fair insight and judgment, anxious mood, made simple decisions, and was reliable[] (See e.g., 17F/2-3; 11; 36)[]" as a basis to support a finding that her mental impairments do not cause more than minimal limitation in her ability to perform basic work activities. (AR 22–23)

But Plaintiff's anxiety, as the ALJ herself reported (AR 22–23), is supported by medical evidence in the record, evidenced by the fact that she had been taking medication for several years (AR 611, 734), had received emergency care for panic attacks (AR 460), and had reported anxiety to providers at various points (AR 444, 455, 460, 475, 615, 734, 753, 758, 763, 768). *See also Lester*, 81 F.3d at 834 ("Once the claimant produces medical evidence of an underlying impairment, the Commissioner may not discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence."). The portions of the record to which the ALJ cites (Ex. 17F/2–3, 11, 36) in support of her rejection of Plaintiff's reported symptoms are pages that are part of reports of Plaintiff's therapy sessions from mental health care providers that, in addition to reports that Plaintiff was "engaged," also report that she required ongoing treatment for anxiety, that she had mild to moderate impairment at a functional level, that she had ongoing stressors, and that she appeared anxious. (AR 873–913); *see Ghanim v. Colvin*, 763 F.3d 1154, 1164 (9th Cir. 2014) (finding that the ALJ "improperly cherry-picked" some of the health care provider's observations of the claimant in light of the context of the diagnoses and observations of impairment).

The ALJ also considered the opinion of psychological consultative examiner Dr. Megan Stafford, finding unpersuasive Dr. Stafford's findings that Plaintiff had moderate impairment in her abilities to accept instructions from supervisors, complete a normal workday without interruptions from a psychiatric condition, and deal with the usual stress encountered in the workplace. (AR 23) The ALJ found that "[a]lthough Dr. Stafford supporting her findings with her examination results, her opinions based on this one-time examination do not appear consistent with the claimant's predominately normal mental status examinations despite an acute exacerbation of stress after the car accident, and conservative mental health treatment without in-patient care." (AR 23) The ALJ cited six exhibits in the record as examples of support for her findings. (AR 23)

But all of the portions of the record to which the ALJ pointed stand for the opposite of the ALJ's findings or are irrelevant. The first exhibit to which the ALJ cited in support, Ex. 2F/13, is a page from a string of progress notes by Dr. Max Duncan, Plaintiff's neurologist. (AR 506–07) Dr. Duncan discusses lab findings, Plaintiff's seizure history, and adjustments to her medications. (*Id.*) In the next exhibit the ALJ cited, Ex. 5F, Dr. Duncan prescribed medication for her anxiety. (AR 611) Again at the next exhibit, Ex. 7F/11, 18, Dr. Duncan continues medication for Plaintiff's anxiety, and although Dr. Duncan reports on this page that Plaintiff appeared "alert and oriented[,]" (on which the ALJ is presumably leaning), that is a report of Plaintiff's physical appearance, which would not constitute substantial evidence, particularly in light of the larger context, as to mental impairment. (AR 632) And the next piece of evidence to which the ALJ cited in support, Ex. 10F/23, is a report from one of Plaintiff's therapy sessions that occurred via telephone and where the provider reported that Plaintiff appeared "possibly nervous" and that Plaintiff was taking medication. (AR 763–64) The final exhibit listed in support of the ALJ's findings, Ex. 17F/19, is another report from one of Plaintiff's therapy sessions where the provider stated that Plaintiff's mood was "anxious[.]" (AR 891)

The record clearly reflects Plaintiff's years-long history of anxiety. (AR 294, 444, 447, 455, 460, 475, 615, 681, 734, 753, 768, 824) Despite Plaintiff's diagnosis, medication, therapy visits, and reports to providers of her anxiety, the ALJ did not find it to be a severe impairment, rejecting as unpersuasive part of the medical opinion of her own consultative examiner and due to Plaintiff's apparently normal presentation at various points. (AR 23) Not only is there a mountain of evidence as to Plaintiff's ongoing struggles with anxiety, but there is Dr. Stafford's determination that Plaintiff has mild or moderate impairment in her ability to accept instructions from supervisors, complete a normal workday without interruptions from a psychiatric condition, and deal with the usual stress encountered in the workplace. (AR 615) To reiterate, the screening at step two is *de minimis*, *Smolen*, 80 F.3d at 1290, and on this record, the ALJ did not provide substantial evidence to find that Plaintiff's mental impairment was not severe.

What's more, to the extent that the ALJ relied on her finding that Plaintiff underwent only "conservative mental health treatment without in-patient care[,]" courts in this circuit have

consistently held that the administration of medications that can alter behavior to treat a mental condition is not conservative treatment. *See, e.g.*, *M.R. v. SSA Comm'r*, No. 25-CV-04832-EMC, 2026 WL 594155 (N.D. Cal. Mar. 3, 2026); *Baker v. Astrue*, No. ED CV 09-1078 RZ, 2010 WL 682263, at *1 (C.D. Cal. Feb. 24, 2010) ("Where mental activity is involved, administering medications that can alter behavior shows anything but conservative treatment"); *Quiroz v. Berryhill*, No. 8:16-CV-02127-GJS, 2018 WL 922130, at *7 (C.D. Cal. Feb. 14, 2018) ("Nothing in Social Security jurisprudence requires mentally impaired claimants to be subjected to harsh treatments—whether involuntary psychiatric hospitalizations, electroshock, or whatever other non-'routine care' the ALJ apparently believes is necessary to prove that a mentally ill claimant actually suffers from the functional limitations found by her treating psychiatrist—before they can be found to be disabled."). In light of the entire record, claiming that Plaintiff's treatment was conservative, then, is not substantial evidence such that Plaintiff's mental impairment should be deemed nonsevere at step two, and this finding therefore contributed to the legal error at this stage.

The evidence establishes that Plaintiff's mental impairment constituted more than a "slight abnormality" that had "no more than a minimal effect on her ability to do work," which is all Plaintiff needed to show at the second step. *Smolen*, 80 F.3d at 1290 (quoting Social Security Ruling 85–28); *see also Yuckert v. Bowen*, 841 F.2d 303, 306 (9th Cir. 1988) (adopting Social Security Ruling 85–28). The ALJ's finding that Plaintiff only suffered from one severe impairment is not supported by substantial evidence and necessarily infected error into the ALJ's RFC formulation. This error was therefore not harmless.

With regards to Plaintiff's musculoskeletal impairments, the court agrees with the Commissioner that any error in finding that these impairments were not severe was harmless in light of the ALJ's consideration of Plaintiff's physical limitations at step four. (AR 27–32)

**B. The ALJ Erred at Step Three**

Plaintiff argues that the ALJ failed to properly evaluate whether Plaintiff's seizure disorder met or medically equaled the criteria set forth in Listing 11.02 when the ALJ suggested that Plaintiff was not taking her medication as prescribed and when the ALJ noted that not all of Plaintiff's seizures were independently documented. (Pl.'s Br. at 16–17) Plaintiff additionally contends that

the ALJ failed to properly evaluate the medical source opinion of Dr. Max Duncan, Plaintiff's neurologist. (*Id.* at 18) Plaintiff argues that the ALJ's reasons for finding Dr. Duncan's opinion unpersuasive do not provide the ALJ with a "legitimate basis" for rejecting his opinions and that his opinion is largely consistent with the record. (*Id.* at 18–19) The Commissioner contends that Plaintiff did not meet her burden of showing that her seizure disorder met the medical criteria of Listing 11.02 given the ALJ's findings of sporadic evidence of tonic-clonic seizures and Plaintiff's failure to produce a witness to any dyscognitive seizures. (Comm'r's Br. at 13–14) The Commissioner also asserts that the ALJ's findings are supported by the record and that Plaintiff cites to records predating her amended onset date. (*Id.* at 9)

The inquiry at step three is whether any impairment or combination of impairments meets or equals one of the enumerated conditions in 20 C.F.R. Pt. 404, Subpt. P., App. 1. Listing 11.02 sets forth the requirements for a finding of an impairment of epilepsy, which requires the documentation of "a detailed description of a typical seizure and characterized by" one of the following: (A) generalized tonic-clonic[5] seizures occurring at least one a month for at least three consecutive months despite adherence to prescribed treatment; (B) dyscognitive[6] seizures occurring at least once a week for at least three consecutive months despite adherence to prescribed treatment; (C) generalized tonic-clonic seizures occurring at least once every two months for at least four consecutive months despite adherence to prescribed treatment and some additional limitations;[7] or

[5] "Generalized tonic-clonic seizures are characterized by loss of consciousness accompanied by a tonic phase (sudden muscle tensing causing the [individual] to lose postural control) followed by a clonic phase (rapid cycles of muscle contradiction and relaxation, also called convulsions). Tongue biting and incontinence may occur during generalized tonic-clonic seizures, and injuries may result from falling. 20 C.F.R. Pt. 404, Subpt. P., App. 1. Listing 111.00F(1)(a).

[6] "Dyscognitive seizures are characterized by alteration of consciousness without convulsions or loss of muscle control. During the seizure, blank staring, change of facial expression, and automatisms (such as lip smacking, chewing or swallowing, or repetitive simple actions, such as gestures or verbal utterances) may occur." 20 C.F.R. Pt. 404, Subpt. P., App. 1. Listing 111.00F(1)(b).

[7] The additional limitations include a "marked limitation" in at least one of the following: physical functioning; understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself. 20 C.F.R. Pt. 404, Subpt. P., App. 1, Listing 11.02.

(D) dyscognitive seizures occurring at least once every two weeks for at least three consecutive months despite adherence to prescribed treatment and some additional limitations.[8] *Id.* To meet a listed impairment, a claimant must establish that they satisfy all of the listing's criteria. *Id.* §§ 404.1525(c)(3), 416.925(c)(3). "Conditions contained in the 'Listing of Impairments' are considered so severe that they are irrebuttably presumed disabling, without any specific finding as to the claimant's ability to perform his past relevant work or any other jobs." *Lester*, 81 F.3d at 828.

"In Social Security cases the ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983) (per curiam). "The ALJ's duty to supplement a claimant's record is triggered by ambiguous evidence, the ALJ's own finding that the record is inadequate or the ALJ's reliance on an expert's conclusion that the evidence is ambiguous." *Webb*, 433 F.3d at 687.

Here, the medical evidence was sufficiently ambiguous to trigger the ALJ's duty to fully develop the record. As outlined above, Listing 11.02 requires Plaintiff to document a detailed description of a typical seizure characterized by either one tonic-clonic seizure per month for three consecutive months or one dyscognitive seizure every two weeks for three consecutive months despite adherence to prescribed treatment. In finding that Plaintiff's seizure disorder did not meet the requirements of the listing, the ALJ stated that Plaintiff's neurologist, Dr. Duncan, referred only to generalized seizures occurring without differentiation and that the treatment records did not document "reported" seizures nor did reports of seizures specify seizure type such that the listing could be satisfied. (AR 26)

It appears to the court from the record, however, that the requirement of frequency of seizures in the listing is met. Dr. Duncan reported in January 2024 that Plaintiff suffered two to three seizures per week, and Plaintiff testified at the hearing that she was having two to three grand mal seizures (tonic-clonic) per month and five to ten petit mal seizures (dyscognitive) per month. (AR 26, 54, 824) Plaintiff's testimony is not inconsistent with Dr. Duncan's report, as the ALJ later improperly found at step four (AR 32–33), because the seven to thirteen seizures (grand mal plus

[8] *Id.*

United States District Court
Northern District of California

petit mal seizures) Plaintiff reported are consistent with the eight to twelve generalized seizures Dr. Duncan reported (AR 824)—a frequency that appears to satisfy Listing 11.02.

In discussing the dyscognitive seizures, the ALJ said, "However, the frequency of these seizures is undetermined. Treatment records do not document reporting of seizures to medical providers between February 9 and August 22, 2022. Thereafter, reporting was sporadic/undocumented." (AR 26) It is true that there are gaps in documentation of seizures to medical providers. But Plaintiff is examined by her neurologist every six months, and it seems to the court unreasonable for Plaintiff to be required to call her neurologist every time she has a seizure so that it may be documented (which, according to Plaintiff, would be several times per week). (AR 51) At any rate, both Plaintiff and Dr. Duncan reported her frequency of seizures, and there are reports to other health care providers in the record indicating that Plaintiff was having regular seizures such that Plaintiff and Dr. Duncan's reports of the frequency of her seizures are not inconsistent with each other or with the requirements of the listing. (AR 78, 111, 499, 611, 630, 632, 638, 681, 734, 768, 782)

To the extent that the ALJ needed information on the type of seizures Plaintiff was experiencing to evaluate whether Listing 11.02 was met, the ALJ should have acquired additional information. On remand, the ALJ must reevaluate at step three whether the type and frequency of Plaintiff's seizures meets the requirements of Listing 11.02 by more fully developing the record, which could be accomplished by taking actions such as sending a questionnaire to Dr. Duncan regarding the frequency of Plaintiff's tonic-clonic and dyscognitive seizures or by hiring a consultative neurologist.

Finally, with regards to the ALJ's assertion that Plaintiff "was sometimes forgetful in taking her medication," (AR 25–26), the ALJ cherry-picked from the record Plaintiff's testimony that she had on occasion forgotten to take her seizure medication. Adherence to prescribed medication means, according to the listing, that the claimant has taken medications "for three consecutive months." 20 C.F.R. Pt. 404, Subpt. P., App. 1., Listing 11.00C. The ALJ pointed to the hearing testimony for the finding that Plaintiff has forgotten on occasion to take her medication; however, Plaintiff testified that she had forgotten prior to seeing Dr. Duncan, whom she started seeing ***before***

her alleged onset date. (AR 62) The ALJ also noted that, after Plaintiff was prescribed Keppra in 2021, blood testing was performed on three subsequent occasions, which “leaves expanses of times during which adherence to medication is not fully supported considering that both Keppra and Lamictal medication caused stomach pain, nausea, and vomiting, and the claimant was sometimes forgetful in taking her medication.” (AR 25–26) A record from Dr. Rain Moore, Plaintiff’s primary care provider, on March 26, 2021, states that Plaintiff was “not remembering her pills[]” and that “sounds like she was missing doses.” (AR 450) A record from Dr. Mary Boegal, who examined Plaintiff for shoulder pain after a fall from a seizure, on March 20, 2021, states that “[w]hen taking medication as prescribed she doesn’t get them.” (AR 452) And a record from Dr. Cady from May 12, 2020, who evaluated Plaintiff in the emergency room for pain and anxiety reflects that Plaintiff informed the physician that she had not been taking her prescribed medication. (AR 475) Crucially, though, these reports are not within the time period pertaining to Plaintiff’s claim, and she admitted herself that she had been forgetful several years prior. (AR 62) These records are not inconsistent with her testimony, and the ALJ does not point to anything that could constitute substantial evidence that she was not taking her prescribed medication for at least three consecutive months since April 2022.

Given that Plaintiff’s additional contentions of error would not afford her any more relief than what is already done by remanding this case on the step two and three errors outlined above, the court need not address the remaining allegations.

## CONCLUSION

For the foregoing reasons, the court **REVERSES** the decision of the Commissioner and **REMANDS** this matter for proceedings in accordance with this Order. A separate judgment shall issue.

**IT IS SO ORDERED.**

Dated: September 24, 2026



ROBERT M. ILLMAN
United States Magistrate Judge

United States District Court
Northern District of California